**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **2:08-cr-299** |
| **v.** | ) | |
| | ) | |
| **ALLEN BROWN also known as** | ) | |
| **ALLAN BROWN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER OF COURT**

August 12, 2009

Pending now before the Court is the DEFENDANT ALLEN BROWN'S MOTION TO SUPPRESS EVIDENCE UNDER FRANKS V. DELAWARE WITH CITATION AUTHORITY filed by Defendant Allen Brown (Document number 51), the GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE UNDER FRANKS V. DELAWARE filed by the United States of America (Doc. # 53), and DEFENDANT ALLEN BROWN'S REPLY TO THE GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE UNDER FRANKS V. DELAWARE WITH CITATION OF AUTHORITY (Doc. # 55). On July 14, 2009, an evidentiary hearing was ordered to consider the motion, and the hearing was conducted on July 31, 2009. All parties were represented by counsel who presented and argued the issues skillfully and effectively. The motion is now ripe for disposition.

Based on the testimony and evidence presented during the suppression hearing and the applicable law, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Criminal Procedure 12(d). For the reasons that follow, the Court will grant

Defendant's motion.

## FINDINGS OF FACT

The facts surrounding the bank robbery and subsequent criminal investigation are basically not contested.  On October 1, 2007, two armed men robbed the S & T Bank in Ford City, Pennsylvania, at approximately 9:15 a.m.  In the course of the robbery, the two men wore identical Halloween scream-type masks covering their entire heads.  Upon exiting the bank building following the robbery, the two men fled and proceeded in the direction of the Armstrong County School District Administration building.  At the time an Armstrong County School District delivery van was parked outside the administration building.  The van's doors were open and the keys were in the ignition as the driver was making a delivery inside the building.  The unattended van was presumably taken by the bank robbers and driven to an area approximately one half mile from the bank, where it was apparently abandoned along Hobson Drive, near the intersection with Pennsylvania State Route 66 ("SR 66").  The van was located and processed by police later that morning.  The police recovered one of the two Halloween masks inside the van. The second mask has not been recovered.

Shortly after the robbery, a criminal investigation was initiated by the Pennsylvania State Police ("PSP"). The investigation was led by Trooper First Class Shane W. Lash, a criminal investigator from the nearby Kittanning station.  Special Agent Robert Smith of the Pittsburgh branch of the Federal Bureau of Investigation ("FBI") also responded to the robbery scene that morning.  Special Agent Smith and Trooper Lash agreed that the PSP would assume the lead role over the investigation, given, among other considerations, the fact that the Kittanning PSP station was located much closer to the scene of the crime.

As part of the investigation, PSP Troopers conducted numerous interviews of potential witnesses. *See, generally*, Def. Exhibit D (PSP investigation report dated Nov. 14, 2007); *see also*, Doc. # 51-3 pp. 1 - 26, (an expanded copy of the PSP investigation report attached as Exhibit 2 to Defendant's motion to suppress, comprised of the report dated Nov. 14, 2007, and the supplemental report dated Jan. 24, 2008). The information obtained in the course of those interviews is the focus of Defendant's challenges to the affidavit in support of the search warrant.

On October 1, 2007, Eva Marie Forncerk was interviewed by Trooper Lash. She was waiting at a bus stop close to the intersection of SR 66 and Hobson Drive that morning. She recalled having seen a small white car driving along Hobson Drive between 7:50 a.m. and 8:00 a.m. in the area where the van was later recovered. The car stopped, the ignition was turned off, and the car sat for approximately ten minutes, before backing up and proceeding away along SR 66. At the time, she did not see the vehicle's registration or the occupants. Def. Ex. D at p. 5.

On October 1, 2007, Robert Nason Nimerosky was interviewed by Trooper Timothy Amy. He recalled seeing a small silver vehicle pass him along Hobson Drive. As it passed him, the vehicle was driving away from SR 66 before turning around in a parking lot and proceeding back in the direction SR 66. At approximately 9:15 a.m., he saw the same vehicle parked along Hobson Drive where the van was later found. The car had a white wash cloth hanging from the driver's side mirror. Def. Ex. D at p. 14.

On October 2, 2007, the Pittsburgh field office of the FBI issued an informational bulletin referred to as a letterhead memorandum, or "LHM", which described the robbery and suspects, and indicated that the suspects remained at large and were armed and dangerous. Def. Ex. B.

On October 3, 2007, Melissa Elaine Turek was interviewed by Trooper Richard Fennell.

She recalled seeing a silver Volkswagen Jetta parked along Hobson Drive close to SR 66 at approximately 8:16 a.m. on the morning of the robbery.  The vehicle had duct tape around the driver's side mirror.  She also saw two people wearing dark clothing with hooded sweatshirts walking along Route 66.  At approximately 9:25 a.m. that same morning, she saw the same vehicle traveling southbound on Route 66 driven by someone wearing a white t-shirt.  She did not see if someone else was in the car.  Def. Ex. D at p. 12.

On October 9, 2007, Fely Rupert was interviewed by Trooper Lash.  She lives along Hobson Drive.  At approximately 8:10 a.m. on the morning of the robbery, she left her house to travel to a local grocery store.  She saw a foreign made white car with a blue stripe parked at the end of Hobson Drive near SR 66.  She saw a rag hanging off of the driver's side mirror.  When she returned to her house at approximately 8:15 a.m., the car was still parked there.  She did not see anyone walking nor did she see the license plate on the car.  Def. Ex. D at p. 8.

On October 9, 2007, Ms. Myschisin, one of the bank employees present during the robbery, informed Trooper Lash that "the other tellers and herself feel that the voice of the robber that took them back to the furnace room sounded like John Wingate [Defendant's uncle] ... who is one of their customers."  Def. Ex. D at p. 9.

On October 11, 2007, Louis John Dowling was interviewed by Trooper Lash.  He was traveling along SR 66 on the morning of the robbery.  Between 8:15 and 8:30 a.m., he saw two black males walking northbound along the side of SR 66 just beyond the intersection with Hobson Drive.  *Id.*

On October 12, 2007, Douglas R. Shreffler was interviewed by Trooper Lash.  At approximately 8:00 a.m. on October 1, 2007, he saw a silver Volkswagen Jetta parked on Hobson

Drive at the place where the van was later recovered.  The vehicle had an out of state registration on the front with a white license plate with blue or black lettering.  There was a bag hanging from the front left mirror.  *Id.*

On November 1, 2007, Edward Bell, Jr. was contacted by Trooper Lash.  He informed Trooper Lash that John Wingate has a nephew who goes by the nickname of "Dinky" who lives in Maryland, drives a silver car, and visits Wingate frequently.  Def. Ex. D at p. 11.

On November 3, 2007, John Wingate was interviewed by Trooper Lash in Stanley's Bar in Ford City.  Wingate admitted that he has a nephew who goes by the name "Dink", who is the son of his sister Judith Brown and lives in Temple Hills, Maryland.  Wingate admitted that "Dink" had visited him during the middle of September of 2007, but denied that "Dink" was in the area during the weekend of the robbery.  *Id.*

In an interview conducted on November 4, 2007, Maxine L. Russell informed Trooper Lash she saw "Dink" come into the Ford City Citgo station where she worked on the Saturday before the robbery, which would have been September 29, 2007.  He was driving a burgundy and tan Mitsubishi Montero.  John Wingate was with him at the time, along with a third person.  Def. Ex. D at pp. 11- 12.

Also on November 4, 2007, Judith Brown was contacted via telephone by Trooper Lash and admitted she has a son Allan Brown who has the nickname "Dink".  Def. Ex. D at p. 12.

On November 11, 2007, Rosealee Brumbaugh was interviewed by Trooper Lash.  She recalled seeing a gray car with Maryland plates parked along Hobson Drive on the morning of the robbery.  A rag was hanging from the driver's window.  Def. Ex. D at p. 13.

While the investigation was led and conducted in large part by the Pennsylvania State

Police, the FBI did provide occasional support.  On November 13, 2007, Trooper Lash updated

Special Agent Smith on the status of the investigation via telephone.  Trooper Lash also asked

Special Agent Smith to arrange to have federal agents in Baltimore check the residence of Allan

Brown[1] in order to attempt to locate a silver Volkswagen Jetta, and to take photographs of it and

any other vehicles that may be located at the residence.  Special Agent Smith also indicated that

agents should also attempt to interview Defendant's mother, Judith Brown.   Def. Ex. D at p. 12.

Special Agent Smith proceeded to make the request of the FBI Baltimore field office on

November 14, 2007, in the form of an electronic communication[2].  Def. Ex. A.

On November 15, 2007, Trooper Lash received a report from Special Agent James

Mollica of the Baltimore field office, forwarded by Special Agent Smith, which detailed an

interview with Judith Brown.  Among other things, she admitted that Defendant owns a silver

Volkswagen Jetta and that he visited his uncle John Wingate in Ford City, PA, at the end of

September.  Doc. # 51-3 at p. 25.

On December 11, 2007, John Wingate was interviewed a second time by Trooper Lash

and Trooper Fennell.  Among other things, Wingate now admitted that "Dink" was visiting him

on the day of the robbery, and was driving his gray Jetta at the time.  He recounted that the

Defendant left his residence at 8 a.m. that morning and did not return until around 10:00 a.m.

Wingate explained that "Dink" left to purchase groceries.  Wingate admitted that "Dink" owns a

---

[1]  Prior to making this request, Trooper Lash learned that the address identified on
Defendant's driver's license is the same address as his mother Judith Brown.

[2]  "Electronic communication" refers to a particular format of correspondence between
sister branch offices of the FBI used, among other things, for requesting an agent from the
receiving office to carry out some measure of assistance.

9mm handgun.  Wingate further acknowledged that his previous comments were false, and that he raised Defendant and considers him to be more like his son as opposed to his nephew. Wingate denied robbing the bank.  *Id.* at pp. 25-26.

On or about January 23, 2008, and at the request of Trooper Lash, Special Agent Smith did not see copies of the PSP investigation reports or any witness statements.  Further, Special Agent Smith did not participate in any of the above mentioned witness interviews.

On or about January 23, 2008, and at the request of Trooper Lash, Special Agent Smith prepared an affidavit to support a search warrant application for the collection of a DNA sample from Defendant.  He based his statements in the affidavit on discussions which he had previously had with Trooper Lash regarding the ongoing investigation.  Special Agent Smith subsequently received a copy of the PSP reports from Trooper Lash and he testified that he read them, but he did not review the reports in detail to reconcile the contents of the reports with the factual assertions set forth in the drafted affidavit.  The affidavit was actually prepared by an Assistant United States Attorney in Pittsburgh with information from Special Agent Smith, who reviewed and authorized the affidavit before forwarding it to the Baltimore field office of the FBI on or about February 4, 2008, with instructions to apply for the search warrant.

On February 14, 2008, Special Agent James J. Mollica, Jr., presented the application and affidavit for a search warrant to U.S. Magistrate Judge Thomas DiGirolamo, who reviewed it and issued the warrant.  *See* Govt. Ex. 1.  As will be discussed below, one of Defendant's objections is to factual assertions contained in paragraph seven of the affidavit.  In relevant part, the other portions of the search warrant affidavit included the following facts: a) the bank was robbed on October 1, 2007, by two armed men wearing Halloween masks, (*see*, Govt. Ex. 1 at ¶¶ 5 and 6);

b) one of the masks was retrieved from the Armstrong County School District van discovered

approximately a half a mile from the bank, (¶ 6); and c) the mask was sealed and retained in

order to determine if DNA could be collected from it (*Id.*).[3]  Germane to Defendant's motion is

the content of paragraph 7 of the affidavit, which stated as follows:

> Through investigation, your affiant has learned the following:
>
> (a)  a credible source of information disclosed that in the time preceding the robbery three individuals known to this source as Perry Bell and John Wingate, both of Ford City, PA, and Allen Brown, a relative of Wingate visiting from Baltimore, Maryland, had spent time together in Ford City.
>
> (b)  after the robbery, PSP Troopers interviewed John Wingate who indicated on the morning of the crime he saw Allen Brown leave an address in Ford City at around 8a.m. in a silver Volkswagen Jetta.  Your affiant has since determined that Allen Brown operated a silver or gray Volkswagen Jetta with Maryland registration.  Wingate further stated that at 10 a.m., or thereabout on the same day, he saw Perry Bell and Allen Brown return in the silver Jetta to the address from which Brown had departed earlier in the day.
>
> (c)  Police interviews of various witnesses following the robbery reported witnessing the stolen Armstrong County School Administration van meet up with a silver Volkswagen Jetta having a possible Maryland registration. Witnesses then observed the silver Jetta drive away from the area where the van was left parked.

Govt. Ex. 1.  While there were two pictures attached as exhibits to the application and affidavit

for the search warrant, the PSP investigation reports were not.  Neither party has produced copies

of the photographs attached to the affidavit, but given the testimony from the evidentiary hearing,

the pictures were from bank surveillance cameras of the two masked men during the course of

the robbery itself.  Accordingly, as presented, the affidavit itself contained the only information

---

[3]  On October 4, 2007, the mask was transferred from Kittanning to the Greensburg PSP
crime lab for testing.  *See*, Doc. # 51-3 at p. 17.  In his motion to suppress, Defendant has raised
no challenge  regarding the results of that laboratory testing and whether those results formed a
reasonable avenue of investigation warranting the application for the search warrant.

which allegedly connected Defendant to the robbery upon which the U.S. Magistrate Judge could

base his decision regarding probable cause.

## CONCLUSIONS OF LAW

Defendant moves to suppress the collection of his saliva for DNA based upon the lack of

probable cause to support the issuance of a search warrant.  More particularly, Defendant argues

that the affidavit in support of the warrant contained both material false statements and material

factual omissions.  Doc. # 51.  With respect to the claim of material false statements, the

government conceded that the subject statement was false, but further responded that the false

statement was simply an error, not made deliberately or with a reckless disregard for the truth,

and even if it was excised, the affidavit would nevertheless establish probable cause without

considering the false statement.  Doc. # 53.  With respect to the Defendant's claims of factual

omissions, the government responded that the omissions were not material.  *Id.*

In its decision in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674 (1978), the Supreme

Court determined that a criminal defendant has the right to challenge the truthfulness of factual

statements asserted in an affidavit of probable cause in support of a search warrant application

after the ex parte issuance of the warrant.  The Court created a mechanism to allow a defendant

to overcome the general presumption that an affidavit of probable cause is valid.  In order to do

so, a defendant must make a "substantial preliminary showing" that the affidavit contained a

false statement, that the false statement was made knowingly or with a reckless disregard for the

truth, and that the false statement was material to the determination of probable cause.  *Id.*; *see

also, U.S. v. Yusaf*, 461 F.3d 374, 383 (3d Cir. 2006).  In order to make this preliminary showing,

the defendant cannot rest on mere conclusory allegations or the "mere desire to cross-examine",

but rather, the defendant must present an offer of proof contradicting the affidavit.  *Yusaf*, 461 F.3d at FN 8 (*citing Franks*, 438 U.S. at 171).

With his motion, Defendant has made a substantial preliminary showing that the affidavit contained a false statement(s) that was either made knowingly or with a reckless disregard for the truth, and that the statement was material.  As such, a hearing was held on July 31, 2009, during which Baltimore based FBI Special Agent Mollica, Pennsylvania State Trooper First Class Lash, and Pittsburgh based FBI Special Agent Smith testified on behalf of the government.

In *Wilson v. Russo*, 212 F.3d 781 (3d Cir. 2000), the Court of Appeals for the Third Circuit set forth standards to identify that which constitutes "reckless disregard for the truth" regarding both misstatements and omissions:

> In evaluating a claim that an officer both asserted and omitted facts with reckless disregard for the truth, we hold that: (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting.

*Id.* at 783; *see also, Yusuf*, 461 F.3d at 383.  If evidence of omissions and assertions were made knowingly, or with a reckless disregard for the truth, the question becomes whether the statements and omissions made with reckless disregard of the truth were "material, or necessary, to the finding of probable cause."  *Wilson*, 212 F.3d at 789 (*quoting*, *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cr. 1997)).  To determine the materiality of the misstatements and omissions, the Court excises the offending inaccuracies and inserts the facts recklessly omitted, and then determines whether or not the "corrected" warrant affidavit would establish probable cause.  *Id.* At the hearing, a defendant must prove by a preponderance of the evidence that probable cause does not exist under the corrected affidavit.  *Id.* at 788.

10

**False assertions contained in the affidavit**

The purpose of *Franks* and its progeny is to deter law enforcement personnel from including recklessly false information in affidavits of probable cause.  *Yusuf*, 461 F.3d at 388, n. 12.  As such, it is important to identify what information contained within the affidavit, if any, is false.  Defendant challenges paragraph 7(c), correctly asserting that "the affidavit stated falsely that witnesses reported seeing a stolen Armstrong County School District van, which was the apparent getaway vehicle, 'meet up with a silver Volkswagen Jetta having a possible Maryland registration,' and that 'witnesses then observed the silver Jetta drive away from the area where the van was left parked.'" Doc. # 51 at p. 2.  The government concedes that the first sentence of paragraph 7(c) is false.  Doc. # 53.   The Court agrees.  From the testimony and evidence, no witnesses saw the subject vehicles stopped, parked, or present at the same place at the same time, and no witnesses saw any person(s) moving from one of the vehicles to the other.

The Court also considers the second sentence of subparagraph 7(c) to be a false assertion, particularly when read within the context of paragraph 7 as a whole.  Reading both sentences of the subparagraph together is misleading in that it clearly suggests that multiple witnesses saw the stolen van proceed to and stop in the vicinity of a parked silver Jetta along Hobson Drive (as described in the first sentence), and that multiple witnesses *then* saw the Jetta drive away from that same location (the second sentence).  The terminology used, particularly the use of the words "then" and "area where the van was left parked", and arrangement of the subparagraph itself, two sentences containing essentially the same subject (multiple witness accounts of activity seen shortly after the robbery in the same location) being grouped into the same subparagraph, appears to be crafted to give the U.S. Magistrate Judge the false impression of a continuous sequence of

events observed by a number of witnesses.  Even if not a deliberate attempt to mislead, the

content of the second sentence is unquestionably a false representation of the observations of

witnesses reported by the PSP.  It is unreasonable to expect that the U.S. Magistrate Judge could

read and interpret the affidavit to reflect the actual information discovered in the course of the

investigation, namely that with respect to any sighting of a silver Jetta after the time of the

robbery, it was a single witness who observed a silver Jetta traveling southbound on SR 66 at

approximately 9:25 a.m.[4]  To that end, there is no evidence from the witness if at the time she

saw the Jetta traveling southbound on SR 66 that the van had been abandoned on Hobson Drive.

Once again, the second sentence of subparagraph 7(c) is constructed in such a way to imply that

it was.  As such, the Court considers paragraph 7(c) in its entirety to be a false assertion.

Assertions are made with a reckless disregard for the truth when, after viewing all of the

evidence, an officer must have entertained serious doubts as to the truth of what was being

asserted or had obvious reasons to doubt the accuracy of the information which he was asserting.

*Wilson*, 212 F.3d at 788.  Assertions can be made with a reckless disregard for the truth even

when they involve minor details - recklessness is measured not by the relevance of the

information, but the demonstration of willingness to affirmatively distort truth.  *Id.*  As such,

recklessness is measured by the conduct of the investigating officer(s).

There appears to have been no reckless disregard for the truth on the part of any of the

PSP criminal investigators.  Defendant has produced no evidence, nor does Defendant even

suggest, that the investigation reports contained false information or that any State Trooper,

---

[4] Earlier that morning, this same witness had seen the same vehicle parked along Hobson Drive at approximately 8:16 a.m.

particularly the lead criminal investigator, conveyed false information to any other person or incorporated false information into an investigation report.  During the hearing, Trooper Lash testified that in the course of updating Special Agent Smith on the status of the investigation, he never communicated the notion that multiple witnesses had seen a silver Volkswagen Jetta "meet up" with the  Armstrong County School District van and then drive away.  No evidence, even the testimony of Special Agent Smith, suggests otherwise.

Similarly, there appears to have been no reckless disregard for the truth on the part of Baltimore-based Special Agent James Mollica.  In and around November 14, 2007, Special Agent Mollica discussed the investigation with Special Agent Smith via telephone on several occasions, received the November 14, 2007 electronic communication written by Special Agent Smith requesting assistance, he interviewed Judith Brown at her workplace in Washington D.C., and prepared a report of that interview which was sent to the Pittsburgh office.  Likewise, in February of 2008, Special Agent Mollica again spoke with Special Agent Smith via telephone about the affidavit and application for the search warrant.  However, at no point did Special Agent Smith review the substance of each witness interview with Special Agent Mollica nor did he provide copies of PSP statements or reports.  That being said, Special Agent Mollica did not have an obvious reason to doubt the truth of the contents of the affidavit provided by Special Agent Smith.

As a general matter, information received from other law enforcement officers during the course of an investigation is generally presumed to be reliable.  *Yusuf*, 461 F.3d at 384-85 (citations omitted).  To demonstrate that a law enforcement officer acted recklessly in relying on information provided from a fellow law enforcement source, a defendant must first show that the

information would have put a reasonable officer on notice that further investigation was required. Upon doing so, a defendant may establish that the officer acted recklessly by submitting evidence: (1) of a systemic failure on the agency's part to produce accurate information upon request; or (2) that the officer's particular investigation into possibly inaccurate information should have given the officer an obvious reason to doubt the accuracy of the information. *Id.* While Special Agent Mollica was cross-examined regarding the subtle but distinct difference between the affidavit, which suggested witnesses saw the van and the Jetta "meet up" then the Jetta drive away, and the electronic communication, which noted that the van was stolen and driven a short distance to an area where a silver Jetta was parked, Defendant was unable to produce any evidence that the contents of the affidavit should have put Special Agent Mollica on notice that further investigation was required.  In this particular case, to expect Special Agent Mollica in the Baltimore field office to essentially verify every piece of information provided by the Pittsburgh field office that is relatively consistent with his own understanding of the investigation would utterly defeat the purpose of the presumption of accuracy of information from a sister field office and result in an almost absurd requirement for the duplication of investigative efforts.

While the presumption articulated in *Yusuf* affords Special Agent Mollica the benefit of relying upon the accuracy of the information contained in the affidavit, the same cannot be said for the actions of those in the Pittsburgh field office.  Special Agent Mollica reviewed the information provided to him and reasonably concluded it to be accurate.  On the other hand, Special Agent Smith of the Pittsburgh field office incorrectly concluded that non-existent evidence actually existed, and, more importantly, took the affirmative step of purposely

14

incorporating the non-existent evidence into the affidavit.  This was done despite not having seen any actual witness statements, not having participated in the interviews of those witnesses who saw a silver or white car on or near Hobson Drive on the morning prior to the robbery, not having reviewed in detail the PSP investigation reports, not having been told any such account of the witnesses by Trooper Lash, and not having asked Trooper Lash to review the content of the affidavit for accuracy before forwarding it to Special Agent Mollica.  As detailed above, no single witness, much less multiple witnesses, can attest to seeing the van "meet up" with a silver Jetta after the robbery and further attest to "then" seeing the Jetta drive away.  To have asserted the existence of such evidence in the face of readily available access to actual evidence to the contrary was a reckless disregard for the truth.

As set forth in the *Franks* decision, courts are required to "set to one side" the affirmative misstatements and determine whether the remaining information in the affidavit supports a finding of probable cause.  438 U.S. at 115, 98 S.Ct. 2674; *see also*, *Yusuf*, 461 F.3d at 389, n. 12.  The redaction process is designed to determine whether there existed a causal connection between the misrepresentation and the challenged search.  *Yusuf*, 461 F.3d at 389; *United States v. Calisto*, 838 F.2d 711, 715 (3d Cir. 1988).  In other words, the process helps courts determine whether the misrepresentation was material, i.e., whether it actually mattered to the Magistrate Judge's probable cause determination.  *Id.*

In this Court's view, setting aside subparagraph 7(c) eviscerates probable cause as to this Defendant.  Without those alleged facts, the affidavit is essentially reduced to the following facts: that on the morning of the robbery, Defendant left the residence of John Wingate "at around 8 a.m." in a silver or gray Volkswagen Jetta, and returned at "10 a.m., or thereabout" with Perry

15

Bell.  There remains no connection between Defendant's Volkswagen Jetta and the stolen school district van, much less any connection between the Volkswagen Jetta and the robbery itself. While the false assertions contained in the affidavit alone would justify granting the motion to suppress, the remaining challenges raised by Defendant nevertheless warrant discussion.

### Material facts omitted from the affidavit

Defendant also moves to suppress the evidence obtained from the search warrant on the basis that material facts known to law enforcement officials were omitted from the affidavit. While the underlying principles are the same, the procedure for considering material omissions varies slightly from the inclusion of false assertions.  Relatively speaking, it is easy to identify false content and, if such content is material and included with a reckless disregard for the truth, to redact that false content for the purpose of assessing probable cause.  When it comes to omissions, however, assessment of that which has been left out of the affidavit is not as easy, particularly in light of the reality that "[a]ll storytelling involves an element of selectivity." *Wilson*, 212 F.3d at 787.  Police officers are not required to relate the entire history of events leading up to a warrant application with "every potentially evocative detail that would interest a novelist or gossip." *Id.*  At the same time, one of the foundations of a Magistrate Judge's evaluation of probable cause is the presumption that an uninterested party is better suited to review and evaluate evidentiary facts than the investigating officer.  *Id.*  "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence.  Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of

ferreting out crime." *Id.* (*quoting Johnson v. United States*, 333 U.S. 10, 13-14, 68 S.Ct. 367 (1948)(*cited in Payton v. New York*, 445 U.S. 573, 586 n. 24, 100 S.Ct. 1371 (1980)).  It necessarily follows that a police officer cannot simply satisfy himself that probable cause exists then merely inform the Magistrate Judge of only inculpatory evidence.  *Wilson*, 212 F.3d at 787.

Like the situation in which false assertions have been included in an affidavit, a defendant must prove by a preponderance of the evidence that the omission of facts in the affidavit was material to the original probable cause determination.  *Yusuf*, 461 F.3d at 383.  Omissions are made with reckless disregard for the truth if an officer withholds a fact or facts in his ken that "[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know."  *Wilson*, 212 F.3d at 787 (adopting the approach of the Court of Appeals of the Eighth Circuit, as articulated in *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)).  When faced with an omission, a court removes the falsehood created by an omission by supplying the omitted information to the original affidavit.  *Yusuf*, 461 F.3d at 384.

Defendant challenged three aspects of the investigation that were omitted from the affidavit: the affidavit failed to inform that John Wingate was a possible suspect in the robbery; the affidavit failed to inform that John Wingate had provided false information regarding Defendant's whereabouts in the first of two interviews with police; and the affidavit failed to incorporate a potentially exculpatory explanation provided by John Wingate as to what Defendant was doing on the morning of the bank robbery.  The three omissions will be addressed seriatim.

As Defendant correctly noted, John Wingate, Defendant's uncle, was considered a possible suspect in the bank robbery, a fact that was not revealed in the affidavit.  The

investigation reflects that a bank teller victim of the robbery, Ms. Myschisin, and other tellers believed that they recognized the voice of one of the bank robbers as John Wingate, a regular customer of the bank.  Trooper Lash, early in the investigation, advised Special Agent Smith that John Wingate was a potential suspect and that Trooper Lash was attempting to locate and speak with him.  While this fact was communicated from the PSP to the FBI Pittsburgh field office, it was not conveyed from the FBI Pittsburgh field office to the FBI Baltimore field office nor to the Magistrate Judge.  Special Agent Mollica did not know that John Wingate, Defendant's uncle, was a possible suspect.  In his conversations with Special Agent Smith, he was not informed that the bank teller victims believed they recognized John Wingate's voice, nor was this fact included in the letterhead memo dated October 2, 2007 (Def. Ex. B), the electronic communication dated November 14, 2007 (Def. Ex. A), or the affidavit prepared by Special Agent Smith (Govt. Ex. 1).  In fact, as far as Special Agent Mollica knew, it was James Wingate, believed to be Defendant's brother, who was considered a suspect along with Defendant, not John Wingate.  According to the information known to Special Agent Mollica, the uncle, John Wingate, was considered little more than a "mildly cooperative" witness.  (Def. Ex. A).

John Wingate being considered as a possible suspect who gave conflicting accounts of Defendant's whereabouts is clearly the kind of information that a reasonable person would know that the Magistrate Judge would want to consider.  As perhaps the most telling illustration of this determination, Special Agent Mollica himself testified on cross-examination that had he known that John Wingate was considered a possible suspect, that fact would have been included in the affidavit.  Instead, John Wingate is actually presented as an important source of information, untainted by the cloak of suspicion, who places the Defendant in a gray Volkswagen Jetta in Ford

18

City for the two hour period during which the robbery occurred.  *See* Govt. Ex. 1.  This misrepresentation by omission is not insignificant.

Defendant argues that affidavit omitted a material fact by also failing to note that John Wingate gave conflicting accounts to investigators.  In an interview on November 3, 2007 ("the first interview"), John Wingate denied that "Dink" was in Ford City visiting him on the weekend of the robbery.  Another interview with John Wingate was conducted on December 11, 2007 ("the second interview"), during which Wingate acknowledged that the Defendant was in fact in Ford City that weekend, and that he did misrepresent the Defendant's whereabouts in the first interview.  Defendant argues that this sequence of inconsistent statements was a material omission in that it degrades the credibility of the assertions made during the second interview.  Doc. # 51 at pp. 11 - 12.  Defendant is correct with one important clarification.

If John Wingate was nothing more than an informant, the Court would not consider this omission to be a reckless disregard for the truth.  To the extent that Defendant's challenge to this omission is premised upon the notion that the information given in the first interview (that Defendant was not visiting John Wingate on the weekend of the bank robbery) should have been included in the affidavit as exculpatory, such a challenge fails.  At the risk of gross simplification, there is a difference between an omission constituting a reckless disregard for the truth and an omission reflecting a reasonably well-founded disregard of false assertions.

As a general rule informants are not presumed to be credible unless the government can show by the totality of the circumstances that, *inter alia*, the information has been corroborated through independent investigation.  *Yusuf*, 461 F.3d at 384 (citations omitted); *see also*, *U.S. v. Buchanan*, — F.3d —, 2009 WL 2213475 (8th Cir., July 27, 2009)(an informant may be

considered reliable if the information he supplies is "at least partially corroborated" by other sources). Investigators had amble corroboration to believe that Defendant was in Ford City on the day of the robbery, evidence which was used to confront, and was ultimately confirmed by, John Wingate. Likewise, to the extent that conflicting responses given in the interviews reflect upon the credibility of John Wingate as an informant, omitting the fact that he changed his story during the second interview, is not, in of itself, a reckless disregard for the truth. An informant who freely admitted to providing false information during an earlier interview in a misguided attempt to cover for someone he regarded as a son does not strike at the core of the probable cause finding. *See U.S. v. Sarras*, — F.3d —, 2009 WL 2176643 (11th Cir., July 23, 2009)(a self-serving denial, on its own, does not defeat probable cause).

However, John Wingate was more than an informant, he was a suspect. The entire complexion of the information regarding the Defendant's whereabouts on the morning of the robbery provided by John Wingate changes in light of the fact that Wingate was himself a suspect. A suspect who provides conflicting information to police regarding the whereabouts of a fellow suspect is the kind of information a Magistrate Judge would want to consider, particularly in this case, where the information provided by John Wingate in the second interview is unquestionably essential to the determination of probable cause.

By the same token, John Wingate's explanation that Defendant left the house that morning to purchase groceries is immaterial by itself, but material in the larger context, to wit: one suspect, already confronted with his own previous deception and the suspicion of his own role in the robbery, attempting the explain the movements of another suspect. As such, it is also the kind of information the Magistrate Judge would want to know, and it should not have been

omitted from the affidavit.

To be clear, the false assertions contained in subparagraph 7(c) justify the granting of Defendant's motion to suppress.  Further, however, taken as a whole, the false assertions coupled with the omissions of material fact regarding John Wingate further necessitate suppression of the evidence.  Beyond that, however, the Court offers no opinion as to whether the omissions alone, assuming *arguendo* that the Court determined the affidavit to contain no false assertions, would also result in the suppression of the evidence.  To otherwise offer such an opinion would require an inappropriate traverse through a hypothetical landscape, which the Court is not inclined to do.

## CONCLUSION

For the reasons hereinabove stated, the Motion to Suppress Evidence filed by Defendant will be granted.  An appropriate Order follows.


BY THE COURT:


s/  Terrence F. McVerry
United States District Court Judge


cc:    Shaun E. Sweeney, AUSA
       Email: shaun.sweeney@usdoj.gov

       Marketa Sims, Esquire
       Email: marketa_sims@fd.org

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **2:08-cr-299** |
| **v.** | ) | |
| | ) | |
| **ALLEN BROWN also known as** | ) | |
| **ALLAN BROWN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER OF COURT**

AND NOW, to wit, this 12th day of <u>August</u>, 2009, in accordance with the foregoing

Findings of Fact and Conclusions of Law, DEFENDANT ALLEN BROWN'S MOTION TO

SUPPRESS EVIDENCE UNDER <u>FRANKS V. DELAWARE</u> WITH CITATION OF

AUTHORITY is **GRANTED** and evidence of the biological samples obtained from Allen

Brown on February 20, 2008, and the results of any DNA analysis or fruit(s) thereof, be and same

are hereby **SUPPRESSED** and shall not be admitted as evidence in any criminal prosecution trial

on the instant indictment.

BY THE COURT:

<u>s/Terrence F. McVerry</u>
United States District Court Judge

cc:    Shaun E. Sweeney,
         Assistant United States Attorney
         Email: shaun.sweeney@usdoj.gov

         Marketa Sims,
         Assistant Federal Public Defender
         Email: marketa_sims@fd.org